Our third argument of the morning is in Appeal No. 22-2870, Antonio Smith v. John Kind and others. Good morning Mr. Smith. Good morning, Your Honors. May it please the Court, Doug Smith of Mayor Brown LLP on behalf of Plaintiff Appellant Antonio Smith. In this Section 1983 action for violation of the Eighth Amendment's Prohibition on Cruel and Unusual Punishment, I'll be addressing Mr. Smith's excessive force claims and my colleague Anna Durham will be addressing Mr. Smith's conditions of confinement claim. The core question in an excessive force case is whether the force was applied in a good-faith effort to maintain or restore discipline, or instead, was it maliciously or sadistically imposed to cause harm. As particularly relevant here, the use of chemical agents, such as tear gas or mace by prison officials, to subdue individual prisoners rather than to quell large disturbances should be more restrictive. This Court said that in Stringer as far back as 1980. Also particularly important here, infliction of pain that is totally without any penological justification is per se, per se, malicious. In granting summary judgment for defendants, the District Court myopically focused on what a video of the incident showed. A jury, however, is tasked with, as you know, considering all the evidence, not just one piece of the evidence. If we take a look at the bigger picture, the record contains more than sufficient evidence from which a reasonable jury could readily conclude that defendants developed and then executed on a premeditated plan to punish Mr. Smith for engaging in a prolonged hunger strike. Why did they do this? Because of the burdens that hunger strikes place on the correctional institution and prison staff because they require, according to prison policy, daily wellness checks and ultimately the need to obtain a court order, if necessary, to permit involuntary medical treatment. Mr. Smith? I'm sorry. Go ahead. So having read all the papers, I understand there is some background here with regard to what the various instances and what took place prior to the date of this particular incident. I understand all that. But at the date of the incident, Mr. Smith was ordered to come to the door, right? And if he came to the door, presumably we wouldn't be here today. And so my question to you is, on what do you base Mr. Smith's right to refuse that simple order of just coming to the door? He's not being told to stop his hunger strike, right? He's being told that for whatever reasons that might be custodial, might not be custodial, but he was asked to come to the door. And so the question is, where do you find in the Constitution his right to disobey that order? Right. The right is that the order should have never been given in the first place. This is all part of a premeditated scheme to inflict punishment on Mr. Smith. That really isn't responsive because he had the opportunity repeatedly to comply with the order. And there's nothing unauthorized about that order. Well, what is unauthorized by that order is that it does violate the correctional institution's own policy. The policy itself, and we cited and block quoted in our brief, for an inmate patient who is unable, someone that's malnourished, can't get up, or unwilling, which is the case of Mr. Smith, he did not want to come out of his cell, to report to their on-site appointment site for the medical wellness examination because perhaps they're in segregation or in observation status. The nurse, and here is the mandatory, shall see the inmate patient face-to-face to complete the form allowing for refusical medical treatment. It is a shall mandatory command that the nurse is to come to Mr. Smith, and Mr. Smith can refuse medical treatment. There was absolutely no need to issue an order from the correctional officer to have him come out of the cell. And in fact, on day 45, four days prior to the incident, that's exactly what happened. The nurse came to Mr. Smith, and Mr. Smith said, I don't want to have a wellness check. In the story, no violence was needed. That's what should have happened on day 49 as well. The jury can reasonably infer that the use of force, any use of force, was wholly unnecessary. This sounds like completely second-guessing correctional officials on correctional issues and letting prisoners decide which orders to comply with. It's not prisoners deciding which orders to comply with. The policy is set by the correctional institution itself. Presumably, the correctional staff can depart from that or override it if they want to. Right, but the whole purpose of the policy is to avoid the very situation that happened here where there is a physical altercation. Keep in mind, we are dealing with someone that is on day 49 of a hunger strike, weak and enfeebled. There is absolutely no reason to order this gentleman out of his cell when prison policy says all that needs to happen is a nurse come to a station and he refuses treatment. There is no need for six people to go to a cell, four of whom are in tactical gear, use a pepper spray on him when he's contraindicated for it because of his asthma. And I see, Your Honor, I'm almost out of my time, so with that, I'll yield to my colleague. Okay, Mr. Smith, thank you. Ms. Durham, good morning. Good morning. May it please the Court, Anna Durham, Pro Bono Counsel for Appellant Antonio Smith. The District Court erred in granting summary judgment on Mr. Smith's conditions of confinement claim. As with the excessive force claims, conditions of confinement claims are uniquely inappropriate for summary judgment because they are so fact-intensive. The law in this circuit is clear. It is a violation of the Eighth Amendment to place a prisoner in a condition of confinement that violates his constitutional right to adequate heat and shelter, which is just what happened in this case. To survive summary judgment on his deliberate indifference claim, Mr. Smith need only show the hazardousness of his conditions and that defendants were deliberately indifferent to those conditions. He has done both. As to the first factor, the District Court itself explicitly recognized that Mr. Smith raised enough evidence to create a genuine issue of material fact as to his Eighth Amendment claim. In fact, the District Court held that Mr. Smith produced enough evidence to raise for the jury the question of whether defendants deprived him of the minimal measure of life's necessities. Ms. Durham, if Mr. Smith was provided a blanket or a smock or some sort of clothing early on, let's say within the first 15 minutes, would we still be here today? Respectfully, Your Honor, that isn't for me to answer. It is a question for the jury. Well, I guess it is for you to answer because I'm asking you. Fair enough. As this court itself held in a case cited by defendants, Dixon v. Godinez, the question of whether the severity of the cold in conjunction with the time in which the inmate had to endure it and the materials provided to him are uniquely positioned for a jury to decide. If he had been given a blanket 15 minutes into the cold cell, maybe we wouldn't be here, but again, that's not what happened in this case. In fact, he was never provided a blanket or bedding or a mattress, and that is not in dispute. Does the reason that the facilities are too cold make a difference here? We've got cases where furnaces broke down and prisoners were bundling up for days on end, for example. Here we've got something quite different, as I understand it. I don't believe it does make a difference whether a furnace broke down or whether the prison was just naturally colder. In fact, there is Seventh Circuit precedent holding that an Eighth Amendment claim was stated where essentially what you're just saying, the heating system in the prison broke down and prison officials said, well, it broke down, we're going to have to fix it. It took four days. The court said, you're not allowed to say it broke down, we don't have a duty to fix it. You don't think that's a little different, though, from deliberately using cold cells as a punishment purpose, as a punishment technique? I would argue both are a violation of the Eighth Amendment. Does the duration of the confinement play into the substance of the Eighth Amendment analysis, and if so, how? Certainly it's a factor, but it's a factor for a jury to consider. Seventh Circuit precedent suggests that the constitutional right is adequate heat and shelter. The question of what is adequate heat and shelter is a question of fact. So, of course, duration and temperature itself— Not amenable to a qualified immunity analysis categorically? That's a tough proposition. So, with respect, the question in a qualified immunity analysis is whether defendants were on notice of the unlawfulness of their— Right, and what I'm trying to figure out is whether your position is that it approaches a per se constitutional violation of the Eighth Amendment to place a prisoner in an unduly cold cell, such that without regard to the duration of that confinement, even if it's one hour, and there's a question of fact about it, it's not even—qualified immunity, you can't even consider it as a legal matter. It goes to trial. Is that the contention? I will do my best to answer that question now, Your Honor, but I'm happy to do some research— Because what you wonder about is, at some point, you'd say, what law was clearly established that put the correctional officer on notice that housing John Doe prisoner in a cold cell for 60 minutes violated the Eighth Amendment? Here, it was not 60 minutes, it was 23 hours. No, I'm trying to figure out the legal principle to think through this, because the cases that we have on heat, and you're right to say they're there, there's no question about it, the facts, at least to my eye, are much more extreme, and they involve much longer periods of time. So, when we have a defendant in front of us that's saying, one, I didn't violate, and even if I did, I'm subject to qualified immunity, I want to know what the framework is for thinking through the qualified immunity analysis. That's why I'm asking you that. Understood, Your Honor. Yeah, go ahead. The question is whether defendants were on notice of the unlawfulness of their conduct. So, it is a question of whether the case law taken as a whole— Again, case law is legion that inadequate heat and shelter are a violation of the Eighth Amendment. The question is whether that case law taken as a whole and applied to these circumstances would have put defendants on notice. Here, it was 23 hours in the cell where the temperature got as low as 25 degrees. We have nine written complaints from other inmates that the cells were blowing cold air. Defendants checked on Mr. Smith every 30 minutes. Mr. Smith requested materials to be transferred to a warmer cell to Mr. Retzlaff. Mr. Retzlaff said, I'll return. Mr. Retzlaff never returned. Defendants were on more than adequate notice of the conditions in which Mr. Smith was housed. Could I ask one question? So, as I understand it, at one point, Mr. Smith was given an offer that he could have a blanket or a smock if he agreed to go to the nursing station to do his daily interaction with the nurse, and he said no. Was that a constitutionally proper procedure? And if your answer is no, on what do you base that? Is your question whether a conditional offer of provisions is constitutionally inappropriate? I believe that it is constitutionally inappropriate because defendants have a duty under the Constitution, point blank, to provide adequate protection from cold. The provision of protection from cold, i.e., compliance with the Constitution, cannot be conditioned on submitting to a medical evaluation. Okay, thank you very much. We'll hear from Mr. Whitney, is it, and then Mr. Hirsch will be up for rebuttal. Okay, very well. Thank you. Good morning, and may it please the Court. This case arises out of Antonio Smith's belief that he had the right to disobey orders. It was this belief that had him deliberately ignore repeated orders to exit his cell for a scheduled medical evaluation. Well, Mr. Whitney, given what happened before this event, subjectively at least, one can see why Mr. Smith didn't think he'd have to come to the door because previously the nurse came to him, and then after that he just laid in his bed, put his hands behind his back, and he was extracted on two different occasions. And so I guess my question is, you know, the colleagues on the other side say that there's no justifiable reason for them to go ahead and engage in this extraction technique. And I guess my first question to you is, why was it that the nurse just didn't come and see him, and why was it that they used the extraction technique that they did when on two or three prior occasions they were able to just go and get him? So the reasons they used, they took him out of the cell in the first place, I think on the three days previous to the day of the incident on this date, was to bring him out and to see if to bring him down to the HSU to refuse his appointment. I think the record shows that the nurses in this instance thought that that was the policy, that if an inmate wanted to reject or decline an appointment, he needed to be brought down to the HSU and reject in person. So in the incident reports, it shows that the nurse would tell Captain Van Lannen or one of the correctional officers to go get Mr. Smith and bring him down here and see if we can evaluate him or if he'll decline that. And so that's what they were doing. But on the 24th, I understand that the nurse went to him. On the 24th, the nurse did go to him. And so did the nurse just make a mistake? There might have been some confusion about what the policy actually entailed. It's interesting. In Mr. Smith's declaration, it's on October 10th, I think, that the initial evaluation is done at the hunger strike. So his hunger strike effectively starts around October 10th. From October 10th to November 18th, Mr. Smith does voluntarily walk out of his cell and go down to the HSU to decline his appointment. He admits to that, October 10th to November 18th. But he's wondering the whole time, like, is there a policy that makes me do this? Because the nurses are telling him that's the policy, and he sort of believes it but is searching around for a policy. On November 18th, he finds the policy that the nurses are basing their belief around. He reads the policy, and he thinks he interprets the policy as stating that they need to actually just bring this form down to him to sign it at his cell, and he doesn't need to walk down to the HSU. And so at that point, he starts just staying in his cell. So there's a few days where he just stays in his cell. On November 24th, they bring the form down to him. And then starting November 25th, the nurses continue to say that he needs to come down, and so that's when the cell removals begin. And I think, you know, my friends on the other side, I think this is a point to make where my friends on the other side are more interested in litigating what the policy required and whether there was a violation of the policy in this instance. But the case law is clear that a violation of state law or a violation of, in this instance, a DOC policy, does not make out a constitutional violation. And so whether or not there's an implication, I think if you read the policy that they rely on in this instance, it never says they can't bring Mr. Smith out of his cell to go down to the HSU to evaluate him for his hunger strike. And we should keep in mind here that he's not declining an appointment for a headache or for a small cut. He's engaged in a very dangerous self-harm here where he's on hunger strike. It's day 49 or 50 of the hunger strike. Three days after the cell removal in this case, they do get an order to forcibly treat him and feed him. And so the situation is dire here. And I think if – Mr. Whitney, let me tell you what concerns me about this. And that is – and I think this is – I think it's implicit. Mr. Smith, I think it's implicit in the argument he's making, at least in the way they briefed it. Don't we have to focus on, for purposes of the Eighth Amendment, excessive force claim with the tear gas? Don't we have to focus on the exact circumstances that Captain Van Lenen faced when he went to Mr. Smith's cell on November 28th? Would you at least agree with that? In other words, there's a lot of focus on, well, there was this – they put a plan together because they were worried that the prior techniques were known and he might be dangerous. So I view that as it's helpful, it's contextual, but the Eighth Amendment violation doesn't occur in putting the plan together. If there's an Eighth Amendment violation, it occurs when the tear gas is discharged, right? I think that's right. Is that the way you understand – they didn't violate the Eighth Amendment by showing up at the cell door and trying to negotiate with him. There's no way. No, no. It has to be when they shot the – whatever we're calling it – tear gas or whatever. Right, right, right. I think that's right. Okay, it's got to be. And so if that's the case and we look at the circumstances that Captain Van Lenen and his colleagues were facing, you find a man who is lying face down on the bed with his hands behind his back. And as Mr. Smith observed, you have four officers in full body armor. And there's no question, as Judge Lee observed, that there were multiple orders. There was a negotiation effect, at least it was attempted. Come to the door, come to the door, come to the door. Okay, what I wonder about is the constitutional reasonableness at that moment in time of pulling the trigger on the tear gas versus opening the door and putting him in handcuffs, which seemed like it could have happened within about five seconds. The notion that a man in that condition, subservient with his hands behind his back, was going to pose a danger to those officers equipped as they were seems fanciful to me. And so what I wonder about is it's a serious argument, in my view, that he's making about whether, yes, he disobeyed the order. There's no question about that. Does that mean anything goes at that point in time? I mean, you have a guy that goes into an asthma attack, etc. That's what concerns me. I'm setting aside qualified immunity. I'll give you that for now. But that's what concerns me. Was it really reasonable to shoot the tear gas? So I think what Captain Van Lannan, what his calculus was here, is that in his experience, the days previous where Mr. Smith is the client is being… Right. Now move forward to the moment in time he gives the order to pull the tear gas trigger. Right? So you're contextualizing it. And that's what, in my question, I'm trying to move you beyond. I get the surrounding context just fine. Yeah. Yeah, but with respect, I think you have to… When Captain Van Lannan's thinking about whether to shoot the tear gas, he has all the days prior experience in his head. So his calculus is… Right, but he also sees in front of him a man on his stomach with his hands behind his back who's been on a hunger strike for, what did you say, 45 days or 50 days or something? I mean, a while. Right. But what he's thinking is that this is exactly what would happen. I mean, in his mind, he would, in a situation where, and again, the case law here says, you know, rumor, reputation, certain imponderables, these are the sort of calls that correctional officers need to make, sort of anticipate catastrophic incidents. So in his mind, he's thinking, he knows what happens in the previous days. He's thinking, if we do it the same way this time, Smith may be baiting us in to put himself… I think it's not only the correctional officers who I agree do have a gear on, but it's also for Mr. Smith's safety. If they think Mr. Smith is going to lash out at them if they physically enter a cell with a taser drawn, which they had done the days previous, it wasn't… So there was physical force on those cell removals. If they go in like that and Mr. Smith lashes out, I think it's for Mr. Smith's safety and the correctional officer's safety that they obviate that risk by then shooting the one short burst of chemical agent. And I think there's no case that says that after multiple orders are given, for five minutes they plead with them, 20 times Captain Van Lant asking to come out. So this is your qualified immunity point, right? This is kind of step two of the qualified immunity analysis. Well, I think there's, you say, multiple cases where one or two short bursts of chemical agent applied after multiple orders are given to come out of a cell. It's not only that those defendants are entitled to qualified immunity, it's that there's no violation under the Eighth Amendment in those circumstances. What they need to show here is not that it was reasonable or not. They need to show that Captain Van Lant used that force for a malicious and sadistic purpose, for the very purpose of harming Smith. The force had to be of the sort repugnant to the conscience of mankind. This is a very high state of mind requirement that they have to prove. And I think if you go to the 20th defendant's proposed fact, number 20, it is that the reason for using the agent was to get Smith out of his cell to bring him to the HSU. Mr. Smith agrees with that proposed finding, and I think that's devastating to his case. I think the purpose of using the chemical agent here wasn't used for the very purpose to inflict harm on him. It was to get him out of his cell to bring him down to the HSU. I think that's undisputed. And I think that ends the matter on the excessive force claims. Can you address the conditions of confinement? Sure. So on the conditions of confinement, we believe there's three elements there. He needs to show an extreme. The first is he needs to show an extreme deprivation that created a substantial risk of serious harm to his health. We don't think he's shown that here with the 23 hours in the control cell. There's no case, and my friends on the other side cite no case where 23 hours of the cold that he says that he underwent is an eighth-amount violation. What about our cases that talk about, for example, deliberate indifference to pain for an hour or three hours or six hours? So I think the cold is a little – first of all, on the deliberate indifference part, I don't think there's any evidence of deliberate indifference. Oh, sure. Retzelhoff says, I'll go check. He never comes back. We have to assume that's true. We have to assume that's true, but when he does that, that's 3.30 p.m. The temperature outside – I think Mr. Smith claimed that the temperature outside is the same as the temperature inside. We don't agree with that. I know, and it's going to get colder that night, and he's there overnight, right? He's there overnight, and he's checked on every 30 minutes by correctional officers who come by, and there's no evidence in the record that he's put forward that he complains to any of those officers who come by every 30 minutes that he's too cold. Nonetheless, Lieutenant Wickman at around 3.40 a.m. offers him a smock. He declines the smock because – On a condition that he doesn't want to accept, right? On a condition that he obey orders, which he should obey. He's under an obligation to obey anyway. So he says, I'm not going to give up my right to disobey orders for the smock. So let me just back up. My larger concern here, Mr. Whitney, is that for a long time, exposing prisoners to extreme heat and cold has been treated as a form of – recognized as a form of torture. This is not a breakdown in a heating system here. We're talking about a deliberate choice. And on summary judgment, you may not like it, you may disagree with it, your clients deny it, but on the summary judgment record, we have to assume this is very cold and the defendants know it. So what's the basis for subjecting a prisoner to – deliberately subjecting them to such conditions? So with respect, I don't think there's any evidence that the Captain Van Lannen and Lieutenant Ressloth knew – were working at the facility the night when it got cold in the morning hours of November 29th. So I don't think there's any evidence that they knew the temperature inside the cell block at that point. And what we do know is that Mr. Smith was offered a smock and declined it. I think that's evidence that it wasn't as cold as he said it was. And the standard – I think we have to keep in mind the standard here, which is an extreme deprivation. So the case law says that uncomfortable conditions, even harsh conditions, aren't enough. I think the undisputed fact here – So how cold is too cold in your view? Well, I don't think this court has said how cold is too cold. I think the case is –  What? Should we? Potentially. You know, the cases on the other – we cite cases, the Flores case, where there was extreme cold. The plaintiff said he was extremely cold for 48 hours. Most of those cases people had clothing, right, and some blankets and some ways to protect themselves from the cold. Here we're talking about essentially a naked prisoner being put in an extremely cold cell on the facts that we have to accept for purposes of summary judgment.  And I don't think the case law – there's no case that says – So my friends, I think you were talking about Dixon previously, and Dixon says it's not only the severity of the cold but the length – the duration of the cold. I don't think there's any case that says under 23 hours in a cold cell is sufficient duration to make out an Eighth Amendment claim. And the cases that my friend said on the other side, the Henderson case, the Murphy case, the Antonelli case, those are all highly distinguishable on the facts. In Henderson, there was four days where it was 80 degrees below wind chill outside. The windows were broken in the cell block. There was evidence the heating system was down. The correctional officers were wearing hats, mittens, gloves. There, there was an Eighth Amendment violation. In Murphy, there was extreme cold for a week and a half. In Antonelli, there was frequent – it was frequently extremely cold in the cell blocks. And in Antonelli, too, there's dicta that says there's a few claims that lasted only overnight, or there was a case, Johnson v. Pelker, where an inmate was wet for two and a half days. His bedding and his clothing was wet. And the court says there that those – that time, that two and a half days or a day, was just a temporary inconvenience and didn't make out an Eighth Amendment claim. And we would say the same here. You want to call this a temporary inconvenience? I don't want to call it that. I'm just parodying what this court has said. Okay. Very well. Thank you, Mr. Whitney. Mr. Hirsch. Good morning, Your Honors, and may it please the court. I'll start at the condition of confinement claim because that's where we just left off, and Judge Hamilton to sort of jump off something that you were just saying. I think one issue that hasn't been addressed yet by either side is why Mr. Smith was placed in that control cell in the first instance after this incident. On the prior days, he was extracted. He was not placed in the control cell. And so I think it is a very reasonable inference that he was placed in that control cell to punish him in the cold for disobeying. And I think, frankly, that entire theme runs throughout, and it should be up for a jury to decide whether some of these conflicting explanations and stories make sense or are all evidence that, as my colleague said, Mr. Smith was being punished for exercising his right to hunger strike. So there's a lot of debate about whether this case is about we're claiming that a violation of a policy is a constitutional violation. That's not what we're doing. What we're saying is there was a policy in place, and they departed from that policy. That's not a constitutional violation, but that could raise the inference to a jury of why did they depart from the policy on this day? Why did they stick to the policy previously and now change it? Why did Defendant Van Leyen in the brief say that the march to the nursing station was necessary to test if he could walk, but then in the video he said he was able to walk fine the day before? Why would, in the brief, defendants claim that they were so worried about Mr. Smith proposing an attack or making an attack that they had to use the chemical weapons, but then also say they were so worried about his health and that he might be gravely ill that they had to bring him to a nursing station? This argument is full of conflicts. It's full of contradictions, and that should go to a jury to decide is all of this just a pretext? Is this all a pretext to decide that, frankly, they were tired of Mr. Kine's hunger strikes, they were tired of his prior litigations, and they didn't want to deal with it anymore? And that very well could be, and I think it's not a stretch to say a reasonable jury could reach that conclusion, that that's why they departed from the prior practice, that's why they departed from their prior policy, and that's why for the first time in 40 days they threw him in a freezing control cell overnight. Going back to the condition of confinement claim, this idea that Defendant Van Leyen and Red Slat forgot about him as soon as they went home, I don't know about your honors, but I'm very aware of the outside temperature even when I leave my workplace, and so the idea that they just would forget that it was 20 degrees out overnight as soon as they left is not very convincing to me. Additionally, this idea that, well— You got more than that. He alleged that the next morning there was a comment made to him about how he enjoyed the cold night. Exactly, Your Honor, and I was going to say in terms of the comment or the argument that, well, he was checked on every 30 minutes and didn't say anything, I don't think it would be unreasonable for Mr. Kine, having spoken to Defendant Red Slat, and being told, I have to talk to Van Leyen, he's the one in charge, I'll get back to you, to not repeat that request from everyone who wasn't Van Leyen who came back, because Mr. Kine probably thought, I'm still laying for Mr. Van Leyen's approval. I don't think it's unreasonable for a person in that position to not go back and keep asking all these questions. I think in terms of the qualified immunity piece, just briefly, Your Honor, I think the case law in the Seventh Circuit is pretty clear on the conditions of confinement claims. I think district courts routinely have found that qualified immunity defense doesn't work for these type of claims because it is very well established that putting someone in a freezing cell overnight without any kind of clothing or shelter is a constitutional violation. What's the best case for that? The best case, I mean, I think my colleague said them already, but frankly, I think Dixon, Antonelli, Flores, Henderson, Murphy, all these Seventh Circuit cases all say if you're deprived of heat and you're in cold overnight and you don't have sufficient clothing, that's a constitutional violation. The kicker is that word overnight. There. That's the hard part of what you're saying, because I got a little chart in front of me. They're not overnight cases. That may be the best you can do. I'm not criticizing you. This is a serious issue. But they're not overnight cases, at least to my eye. We have to figure that out, not you. Respectfully, Your Honor, I think in terms of the qualified immunity analysis, the distinction between 48 hours and 23 hours is not sufficient enough to find that this is not clearly established. To Judge Lee's earlier question, if this was five or ten minutes, maybe we lose on qualified immunity because that's too far away from some of these cases. But the point is if you're in a cold cell long enough for without heat, long enough for that to really impact and for you to feel it, that's an Eighth Amendment violation. And I think the distinction between 43, 24, it's just not sufficient enough to find that this law is not clearly established. And if Your Honors don't have any additional questions, I think I'm out of time. Okay. Thank you very much, Mr. Hirsch, Mr. Smith, Ms. Durham. We know that you and your firm took this case on appointment from the court. We very much appreciate that. You've done a fine job for Mr. Smith, and we appreciate your service to the court as well. Mr. Whitman, as always, thanks to you. We'll take the appeal under advisement.